### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - BOSTON

===============================

| | | |
|---|---|---|
| IN THE MATTER OF: | . | Case #04-10157 |
| | . | |
| ONTOS, INC. | . | Boston, Massachusetts |
| | . | **June 29, 2005** |
| Debtor | . | 10:05:50 a.m. O'clock |

===============================

*05 11710 R.S.* (handwritten)

### TRANSCRIPT OF HEARING ON:
### (#29) STIPULATION BY TRUSTEE, JOSEPH C. BUTLER;
### (#30) MOTION TO APPROVE STIPULATION;
### (#53) OBJECTION BY CREDITORS THOMAS McCOY AND T. MARK MORLEY;
### (#54) AFFIDAVIT OF KEVIN O'CONNOR, ESQ.; (#64) RESPONSE;
### (#57) MOTION BY CREDITORS McCOY AND MORLEY FOR ORDER
### AUTHORIZING THEM TO PROCEED AGAINST DEBTOR'S SOLVENT CO--
### DEFENDANTS; (#64) OBJECTION BY TRUSTEE, JOSEPH C. BUTLER;
### (#66) RESPONSE BY FIRESTAR SOFTWARE AND KENNETH LORD
### BEFORE THE HONORABLE WILLIAM C. HILLMAN, J.U.S.B.C.

**APPEARANCES:**

Trustee/For the Trustee:           JOSEPH G. BUTLER, ESQ.
Barron & Stadfeld, PC.
100 Cambridge Street, Suite 1310
Boston, MA 02114
-------------continued---------->

Electronic Sound Recording Operator:   Mary Jo Tedder

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ 08234-5901**
**1-609-927-0299    FAX 1-609-927-6420    1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
04-10157
6-29-2005

**APPEARANCES - -Continued**

For Creditors, T. Mark Morley, and
Thomas J. McCoy:

MAYETI GAMETCHU, ESQ.
Paragon Law Group, LLP
184 High Street
Boston, MA  02110

For Firestar Software, Inc.:

HAROLD B. MURPHY, ESQ.
Hanify & King
One Beacon Street,  21st Fl.
Boston, MA  02108

Electronic Sound Recording Operator:    Mary Jo Tedder

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299        FAX 1-609-927-6420        1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2

1  (At 10:05:50 a.m.)

2          THE COURT:   Ontos, Inc.

3          MR. BUTLER:   Good morning, Your Honor.

4          THE COURT:   Good morning.  Good morning.  Okay.

5  Mr. Butler, I think you're up first.

6          MR. BUTLER:   Good morning, Your Honor.  We have my

7  motion for approval of the stipulation settling the estate's

8  claims against the various parties and the objection by

9  Misters Morley and McCoy, Mr. Morley and McCoy's motion to

10 proceed against the -- basically those same defendants with

11 the same claims.   The gist of the issues here, it seems to

12 me, is twofold, whether the estate controls all of those

13 claims exclusively and whether the settlement's reasonable.

14 I suppose the first issue makes sense to address first.

15          I think that the case law is fairly clear on the

16 fraudulent transfer and successor liability claims that those

17 are in fact assets of the estate, that once the petition is

18 filed I guess the Trustee had the exclusive authority to

19 pursue.  The alter ego claim, piercing the corporate veil

20 claim is slightly different because, granted, the law is less

21 clear, at least in this jurisdiction, but I do believe that

22 the majority of the case law would support the proposition

23 that only I as the Trustee can pursue those claims.

24          Looking over the stuff again this morning, it

25 seemed to me that oddly enough the footnote in the

04-10157                                                    6-29-05

1  memorandum, my memorandum, sir, obviously very similar to
2  the -- the settling parties', dealing with what alter ego
3  claims really are as sort of the -- the heart of that.
4  Those, as I understand them, are not so much a cause of
5  action as a remedy, and all of this kind of boils down to the
6  fraudulent transfer claim because I've assumed throughout the
7  negotiation discussions about this that all of the other
8  things were true, that Mr. Bertoldi and Mister -- I'm
9  terrible with names --  but Vennworks at Amphion  -- and
10  basically controlled the activities of -- of the debtor prior
11  to the select fraudulent conveyance and things of those
12  natures, which would support this alter ego theory.

13         On the other hand you have to have some kind of
14  wrongdoing, and the only wrongdoing that I understand has
15  been alleged is this alleged fraudulent conveyance.  That
16  alleged fraudulent conveyance obviously going back to the
17  fraudulent conveyance theory could be pursued by me on behalf
18  of all of the creditors, not just Mr. Morley and McCoy, and
19  the alter ego theory that comes back into it as the remedy.

20         The problem with all of that and what I just boiled
21  down to for the last year that we've been discussing it is
22  whether the alleged fraudulent conveyance is in fact
23  fraudulent, and that boils down, to me, to a single issue;
24  what was the software worth at the time it was conveyed.  The
25  consideration, in my mind, anyway, is the $590,000, the 490

1 | in cash plus the $100,000 note that was paid.  The assumption
2 | of the 13 million dollars in debt owed to Vennworks and
3 | Amphion, to me, you know, if things had worked out
4 | differently, we'd be arguing about whether that was really
5 | debt or equity and whether it should be subordinated or not
6 | subordinated.  So I don't consider that to be really true
7 | consideration for that transfer.

8 | Beyond all that, though, I don't know what the
9 | software was worth.  I do know several things.  I know that
10 | the -- what the market was like in 2000-2001 when all this
11 | was going down.  I do know that venture capital money had
12 | essentially dried up and specifically was drying up in this
13 | case because, from the facts alleged in the state complaint,
14 | it was clear that they were having trouble making payroll
15 | from week to week, and it -- and as I understand the facts,
16 | you know, they'd have to call up on every Thursday or every
17 | other Thursday, whenever the payroll was due when Amphion or
18 | Vennworks would have to put more money in, and that
19 | apparently it had been made clear that the money's drying up.

20 | If this transaction had not taken place, I wonder
21 | sometimes what would have happened, and I suspect that there
22 | would have been a bankruptcy well prior to the date that
23 | there was one, we would had a company that had software that
24 | there was no market for, which is why I think that the
25 | $590,000 consideration probably was adequate consideration

1  for this software, and although no one could know it at the
2  time in September of 2001 when the software was transferred,
3  it's my understanding that Firestar has never really made a
4  profit with it in the almost four years since.

5  Beyond all of that, Your Honor, the estate has
6  basically no other assets.  It has no cash.  I think that the
7  litigation, if I were to pursue it, would be expensive and
8  lengthy, and I don't know that I could ever prove that the
9  software was worth more than $590,000, and that is really the
10 gist of my argument.

11 THE COURT:  Thank you.  Trustees move to approve a
12 stipulation and asks, of course, that I deny the motion to
13 proceed against the other defendants.  Let's hear the other
14 side if anyone wishes to speak.  Yes, ma'am.

15 MS. GAMETCHU:  Thank you, Your Honor.  Mayeti
16 Gametchu.  I represent the creditors, Tom McCoy and Mark
17 Morley.  Your Honor, just -- just to put this in context, the
18 burden is on the Trustee, of course, to show Your Honor that
19 the proposal is fair and equitable to the creditors, and
20 that's of paramount importance.

21 The -- the state court action that my clients
22 initiated asserted various claims arising out of their
23 employment with the debtor.  In that -- in that litigation
24 discovery had proceeded before the -- before the bankruptcy.
25 Ontos essentially ceased operating as a company in January of

04-10157                                          6-29-05

1  '02 but did not declare bankruptcy.  My clients sued, and

2  discovery commenced.  We then brought a motion to compel the

3  production of documents, and -- and the Court appointed a

4  Discovery Master to adjudicate that motion, and the Discovery

5  Master ordered documents to be produced within ten days and

6  essentially granted most of our requests for production.

7         The very next day, Your Honor, the solvent co-

8  defendants of the debtor and the debtor went into court, and

9  the debtor filed its -- its petition for bankruptcy and

10  effectively stayed the state court litigation two years after

11  this company ceased operating; and we submit to Your Honor

12  that that -- that was strategic insolvency.  It was designed

13  to delay the state court action, and it's an independent

14  grounds for Your Honor to dismiss the bankruptcy outright,

15  and it's against that backdrop, Your Honor, that we're before

16  you.

17         The proposal before Your Honor is -- is to release

18  the debtor's solvent co-defendants from a variety of claims,

19  including the ones asserted by my clients in state court for

20  $50,000.  The Trustee has admitted to -- to my partner, Kevin

21  O'Connor, that he never countered that $50,000 offer, so he

22  never went back to the solvent co-defendants and said, you

23  know, 60,000.  There -- there was absolutely no negotiation

24  whatsoever with respect to that amount.

25         In addition, Your Honor, in the -- in the past year

 1  since Ontos has been in bankruptcy we have repeatedly

 2  requested the Trustee take discovery, which is -- which he

 3  obviously has the power to do.  We've even drafted proposed

 4  discovery requests and provided them to him.  He's refused to

 5  do that.  Instead, he comes before Your Honor, and he opines

 6  as to the validity of our case without ever having taken any

 7  discovery.  Now we -- we've had the benefit of limited

 8  discovery, of course, because the case has been in state; but

 9  even with the limited discovery that we've had the benefit of

10  in state court, we have available facts to us to show Your

11  Honor that our -- that our claims are viable.

12          So against -- against that backdrop, Your Honor, we

13  first ask that we be permitted to proceed in state court on

14  our claims, on our alter ego claim and on our fraudulent

15  conveyance claim.  The Trustee's crack that Massachusetts has

16  not settled the issue of whether or not an alter ego claim is

17  property of the estate or --

18          THE COURT:  But it *is* settled as the fraudulent

19  transfer.  That's *his*, not yours.

20          MS. GAMETCHU:  Okay.  Even putting that aside, Your

21  Honor, with respect to alter ego we would request that the

22  Court allow us to proceed, and in -- and it's -- it's both

23  because we think we're permitted to under the law, but also

24  as an equitable matter, Your Honor.  We're -- we're the

25  creditors.  We're here.  We believe in our claims, and I

1 think we've put forth enough evidence to show that they're
2 viable, and we request that we be permitted to proceed.
3 If -- if Your Honor concludes that the alter ego claim is the
4 property of the estate, we would -- we would ask Your Honor
5 to -- to rule that this proposal is not fair or equitable.

6          Again, the Trustee's opinion as to the likelihood
7 of success of our case comes literally without a shred of
8 discovery in this case, and -- and if we look at his papers,
9 he references the -- the co-defendants' denial of fraud as
10 support for his opinion that this case isn't viable, and
11 those are obviously self-serving statements, Your Honor; and
12 even with respect to the reply to our -- our opposition to
13 the settlement proposal, there are a number of facts that
14 talk about Firestar has never been profitable, and,
15 therefore, there's no reason Ontos would have been
16 profitable, Your Honor.  They have -- they literally have not
17 cited to an affidavit or an e-mail or a document to support
18 that, and we put before Your Honor plenty of similar support.

19          And I'd like to now talk about why -- why we
20 believe our fraudulent conveyance claims and our alter ego
21 claims are valid.

22          THE COURT:  Not the fraudulent conveyance claim.
23          MS. GAMETCHU:  Excuse me, Your Honor?
24          THE COURT:  The fraudulent conveyance claim is not
25 yours.

04-10157                                              6-29-05

1           MS. GAMETCHU:  Well, Your Honor, I'm now -- I'm now
2    talking about in the event that Your Honor does conclude
3    that, that you would -- that you would deny the proposed
4    settlement for $50,000 to release them from liability arising
5    out of that claim.

6           THE COURT:  Okay.

7           MS. GAMETCHU:  And as -- as a basis for that
8    denial, Your Honor, it's -- it's our submission that --

9           THE COURT:  All right.  You go ahead.

10          MS. GAMETCHU:  -- it's a viable claim.

11          THE COURT:  Go ahead.

12          MS. GAMETCHU:  Your Honor, Ontos was a software
13   company that had essentially two products and two divisions
14   along those products.  One product was called ObjectSpark,
15   and one product was called BrightRoad.  Everybody agrees that
16   BrightRoad was worthless, was not sold at any point.  The
17   company received no -- derived no revenues from it, either
18   through the sale of its software services or through any sort
19   of asset sale.  So the only asset of -- of value was
20   ObjectSpark.

21          In September of 2001 the -- the defendants in the
22   state court case, and those -- those people are the -- the
23   principals of the venture capital firms, the venture capital
24   firms themselves, and -- and the then CEO of Ontos.  They
25   basically created Firestar, same owners.  Both the VCs

1  controlled the board of Ontos, the VCs controlled the board
2  of Firestar.  The CEO of Ontos at the time, Kenneth Lord,
3  voted in favor of transferring ObjectSpark to Firestar on
4  behalf of Ontos, and the VCs of the Firestar board also voted
5  on that transaction.  The -- the -- the asset was then
6  transferred to Firestar for roughly $500,000.

7          Within a month of that transaction, Your Honor,
8  these defendants now operating under Firestar -- and I would
9  also add, Your Honor, that -- that the defendants have
10  admitted in depositions that, one, the -- the principal of
11  the VC has admitted that the Firestar assumed substantially
12  all of Ontos's liabilities, and the -- the CEO, Ken Lord, who
13  then became CEO of Firestar, has admitted in his deposition
14  that -- that Firestar was essentially nothing more than a
15  continuation of Ontos.  Those were not his words, but he has
16  admitted that Firestar was comprised solely of Ontos's former
17  employees, Ontos's intellectual property.  They used their
18  computers.  Ken Lord worked out of his same office and used
19  his same computer.  It's the same company, Your Honor.

20          The -- within a month after this transaction when
21  this -- when this software was transferred for roughly
22  $500,000, the VCs and the -- the solvent co-defendants of
23  Ontos went out, and they represented to their investors and
24  their potential investors when they were trying to raise
25  money that it was worth 11 million dollars, and, Your Honor,

1 now they come to you and say, "Well, that was book value, and
2 that doesn't really tell you what market -- what -- what --
3 what fair value or market value is," and I just submit to
4 Your Honor that we've got two different versions here.  When
5 they're in court trying to defend this transfer as  non-
6 fraudulent, they're telling you it worth nothing more than
7 $500,000.  When they're a month later trying to raise money
8 for that same product and the same company, they're
9 telling -- they're telling the world that it's 11 million
10 dollars, and we obviously -- we don't have to prove our case
11 right now, but I think there's enough there, Your Honor, to
12 show that these claims are viable.

13         In addition, with respect to alter ego, the --
14 the -- these -- these venture capitalists absolutely
15 controlled this company.  They didn't just fund it, Your
16 Honor.  They control the board.  They essentially managed it.
17 Our -- my clients were senior executives of this company.
18 They were stripped of their ability to decide what vendors to
19 pay and what vendors not to pay.  They had to get approval on
20 expenditures for items as small as $300.  They were
21 capitalized on a -- on a month-by-month and at times week by
22 week basis.  They had to submit requests that the company
23 was -- was in financial despair, admittedly, so they would
24 have to submit requests and say, "We only have X amount of
25 money, who do we pay first?" and the VCs would tell them who

**Page 12**

1 | to pay.

2 | The VCs hired and fired -- absolutely controlled

3 | this company, and in fact, Your Honor, at the creditors'

4 | meeting the principal of the VCs, Mr. Bertoldi, admitted,

5 | when asked by my partner, Mr. O'Connor, who's representing my

6 | clients at the creditors' meeting, he admitted in sworn --

7 | sworn testimony that he was, quote, "in constant

8 | communication with -- with Mr. Morley," my client, "about

9 | every aspect of all parts of the business." He said it

10 | emphatically, and, Your Honor, the -- we have hundreds and

11 | hundreds of e-mail communications that support this, many of

12 | which we've put before Your Honor.

13 | So I would -- I would -- I would request that if --

14 | if -- if Your Honor does not permit us to proceed in state

15 | court, that -- that Your Honor rejects the proposal for

16 | $50,000 to release these claims. They're worth in excess of

17 | a million dollars, and -- and I would also ask that Your

18 | Honor consider the abuse of the Bankruptcy Code that's taken

19 | place and the fact that this company waited two years until

20 | the day after it was ordered to produce documents in the

21 | state court action that we haven't gotten, obviously, because

22 | it was stayed, to file in bankruptcy and thwart our state

23 | court action. Thank you, Your Honor.

24 | THE COURT: Thank you very much.

25 | MR. BUTLER: Briefly, Your Honor?

1             THE COURT:  Certainly.

2             MR. BUTLER:  On the -- the timing of the filing of
3  the bankruptcy, I had nothing to do with it, obviously.
4  There is no motion before Your Honor to dismiss the case.  It
5  seems to me that -- and timing becomes an issue, but if -- if
6  one were to be brought, it would have been appropriate to do
7  that at the commencement of the bankruptcy.

8             On the negotiations, I don't feel that it's
9  appropriate for me to get into who said what to who and when,
10  but the fact that I didn't counter doesn't mean there were no
11  negotiations.  There were negotiations.  In fact, the offer
12  that I received to settle this was outstanding for a very
13  long time while I talked to Mr. Morley and Mr. McCoy's
14  counsel about whether there was some better offer that they
15  might make to me, and I didn't get one.

16             On the issue of whether BrightRoad, the other
17  software, was worthless, I think we can all agree that today
18  it's worthless.  In September of 2001 whether people felt
19  that way is another issue, and whether it in fact was
20  worthless then I don't know.  I understand that in fact after
21  this alleged fraudulent conveyance of ObjectSpark there was
22  some discussion between the settling parties and Mr. Morley
23  and Mr. McCoy about Mr. Morley and McCoy acquiring
24  BrightRoad, and it didn't come to fruition, but there was at
25  least some indication that it had some value at the time.

1          As I said earlier, with respect to the venture
2 capital people and Mr. Lord voting to do all of this and the
3 venture capital people, you know, controlling the
4 expenditures for some period of time, I assume from the
5 beginning that all of that is true, and -- and -- which gets
6 into the whole issue of discovery.

7          The only indication that I've heard from Mr. Morley
8 or McCoy or seen in the complaint or seen in an of the
9 documents that this software was in fact worth more than the
10 $590,000 that I considered would have been paid for it is
11 that -- that thing about the 11 million dollar valuation of
12 Firestar a month later.  My understanding of that is, as Ms.
13 Gametchu put it, that it was book value, and it was based on
14 the amount that had been invested in previously, really
15 Ontos, but ultimately in Firestar because the 13 million
16 dollars got -- got transferred over when it assumed that
17 debt.

18          I have seen many cases, and I assume Your Honor's
19 seen more where ten million dollars was invested in
20 developing software.  That doesn't make the software worth
21 the ten million dollars, and that's sort of my bottom line on
22 this.

23          Could I do discovery?  Yes, I could do discovery.
24 I could probably do $100,000 worth of discovery, but if I did
25 $100,000 worth of discovery and came to the same point that I

1  started at, that I couldn't prove that the software's worth

2  more than $590,000, then, you know, this -- then that would

3  be a waste of my time and the estate's and creditors'.

4          THE COURT:  Thank you.  Anyone else wish to be

5  heard?  Mr. Murphy.

6          MR. MURPHY:  Just briefly, Your Honor.  Harry

7  Murphy, on behalf of some of the seven defendants, and I'm

8  speaking for the proposed-seven defendants, so I speak also

9  for co-counsel this morning, Your Honor.

10         The most interesting legal issue perhaps raised by

11  some of these papers, Your Honor, is -- relates to the

12  Trustee's standing to settle the alter ego claims, I think,

13  the breach of fiduciary duty, fraudulent conveyance claims

14  is -- really can't be seriously disputed, Your Honor, as your

15  Court's already indicated.

16         This whole -- there is law going both ways, but I

17  think if Your Honor has it, and I have another copy for the

18  Court if you would like, that to look at the complaint that

19  was actually filed by the plaintiffs in state court, if I

20  may, and if I may, point to Paragraph -- Count 6, which is

21  really the so-called may raise a dispute, a legal issue in

22  the -- in the Courts' minds, and that's on Page 12, Your

23  Honor.

24         Do you have one, Counsel?

25         And in my mind this is clearly a claim that the

1  Trustee can settle because you can say there's an allegation
2  not that Newco, the acquired -- the new company, Firestar,
3  but is the venture capital people in its offices of -- in the
4  debtor's offices "used the corporate firm of Ontos for
5  fraudulent purpose and intermingled and such that there's no
6  legal distinction."

7          That's an allegation in Paragraph 73 that these
8  folks visited harm upon the corporation.  That harm was the
9  transaction in question, and I -- you may get esoteric on
10 successful liability and the cases go all the way, but this
11 is not some manifestation to -- of confusing or
12 intermingling.  This is a claim that these folks damaged the
13 corporation, and I think, as with a fiduciary duty claim, as
14 with the fraudulent conveyance claim, if the Trustee's ever
15 going to be able to realize monies for creditors under these
16 cases, he has the ability to prosecute these types of claims
17 and necessarily needs the ability to settle them.

18         I won't speak to the -- to the valuation of claims.
19 Obviously, we don't think much of the claims, but I can tell
20 you we went back and forth with Mr. Butler at some length
21 about the validity of the claims.  We provided him extensive
22 documentations as to what our company did, the acquiring
23 company has done.  It hasn't made any money for the last four
24 years.  Mr. Butler admitted to me it's -- although
25 hindsight's 20/20, if we were making 100 million dollars a

 1 year, he would be asked for more, but we produced tax
 2 returns, we produced other documents to Mr. Butler, and he's
 3 looked at us and (unclear) thing hasn't made any anything.

 4          This is not the first software company that either
 5 one of us has been involved with.  If his point was well
 6 taken that in the absence of the transaction going down for
 7 $600,000 in ultimate cash, this would have been a Chapter 7
 8 back then, and no one would have gotten anything.  So I
 9 suggest that under the circumstances the settlement should be
10 approved.  Thank you.

11          THE COURT:  Thank you.  Anyone else wish to be
12 heard? Would you like the last word?

13          MS. GAMETCHU:  Your Honor, just response to the
14 last comments.  With all -- with all due respect, Your Honor,
15 we -- everything that was just said to you in this -- in this
16 last piece, Your Honor doesn't have an affidavit or a
17 document before you that -- that supports it.  So it's -- I
18 would just point out that we -- we certainly haven't seen
19 these tax returns or these documents that -- that are being
20 referred to here today, and -- and neither has the Court.
21 Thank you.

22          THE COURT:  Thank you, Ms. Gametchu.  Well, I've
23 got two things to deal with.  As to the motion to allow
24 Morley and McCoy to proceed against the solvent co-
25 defendants, that depends on what I consider to be the nature

1 of their claims, the alter ego claims and the other claims.
2 I'm not sure that I agree 100 per cent with Mr. Butler that
3 these alter ego claims are merely a remedy, but I do believe
4 that alter ego and related claims are certainly derivative
5 from any liability that is owed to the debtor here; and being
6 derivative, I believe that they are the Trustee's property
7 and not that of individual defendants -- individual
8 plaintiffs against those other people.

9        Indeed, that's consistent with the whole bankruptcy
10 concept, which is to take all of the goodies and divide them
11 equitably between everybody, and nobody gets an individual
12 piece of the action, and so I'm going to deny the motion to
13 allow Morley and McCoy to continue with their state court
14 action against the other defendants.

15       As to the approval of the stipulation, this has got
16 to be the most amorphous thing on earth.  I don't know if any
17 of the counsel that are present here today were here on
18 another case I had a couple of years ago, and the question
19 was the value of the intellectual property, and we had two
20 experts in.  They were experts, and one said the software was
21 worth 200 million dollars, and the other experts -- I see
22 smiles, they must have been here -- and the other expert said
23 it was worth zero; and they were both right, assuming the
24 assumption on which they based their opinions:  Is it today's
25 software or yesterday's software?

1    Well, I can't make that call. I'm not sure anybody
2 can make that call. We've got a highly experienced Trustee
3 who has done such due diligence as is reasonable under the
4 circumstances. It's not as if the software was given away.
5 There was money for it. I can't say that the Trustee is
6 wrong in wanting to settle the claims for the amount of money
7 he's been offered, and the usual rule is that absent anything
8 that raises my eyebrows, my hackles, or disturbs my stomach,
9 I will go with the Trustee's business judgment, and none of
10 those negative factors are present here.

11    The motion to approve the stipulation is granted.
12 Thank you all very much.

13    MR. MURPHY: Thank you, Your Honor.

14    MR. BUTLER: Your Honor, I -- I can share it with
15 counsel. I have a short proposed order.

16    THE COURT: Well, has everybody seen it?

17    MS. GAMETCHU: No, Your Honor.

18    MR. BUTLER: No. Sorry, Your Honor.

19    THE COURT: If you need one, I was just going to do
20 a proceeding memo and say the motion's granted. Won't that
21 hold you?

22    MR. MURPHY: Your Honor, the draft order doesn't
23 say much more than that.

24    THE COURT: Then forget about the draft order.
25 I'll just enter my proceeding order.

04-10157                                          6-29-05

Page 20

1           MR. BUTLER:  Thank you, Your Honor.

2           THE COURT:  Thank you all.

3           MR. MURPHY:  Thank you, Your Honor.

4                  (End at 10:30:31 a.m.)

5                  * * * * * * * * * * * *

6           I certify that the foregoing is a true and accurate

7    transcript from the electronically sound recorded record of

8    the proceedings.

*[signature]* 7/31/05                                    8/17/05
                                                         proofed
**TARA MARTIN, for**                                     **Date**
**GCI TRANSCRIPTION SERVICES**
**Certified Transcriber NJ AOC200**
      **Federal CERT #122**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
      **FAX  609-927-6420**
**e-mail  irwingloria@comcast.net**

**04-10157**                                           **6-29-05**